USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 10/25/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

JIHIRASAD ADDO,

                Plaintiff,

       v.

NEW YORK HEALTH AND HOSPITALS
CORPORATION, CRYSTAL SIMMONDS,
and KIMONA HANSON,

                Defendants.

No. 15-CV-8103 (RA)

OPINION & ORDER

---

RONNIE ABRAMS, United States District Judge:

        Plaintiff Jihirasad Addo brings this employment discrimination action against her former employer, New York City Health and Hospitals Corporation ("HHC"), and two of its employees, Crystal Simmonds and Kimona Hanson (collectively "Defendants"). Plaintiff alleges that she was discriminated against on the basis of her race, national origin, and age in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e *et seq.*, and the New York City Human Rights Law (the "NYCHRL"), N.Y. City Admin. Code § 8–101 *et seq.* Plaintiff also asserts claims for racial discrimination and retaliation in violation of 42 U.S.C. § 1981 and for breach of contract. Defendants have moved for summary judgment with respect to all of Plaintiff's claims. For the reasons set forth below, Defendants' motion is granted as to Plaintiff's Title VII and 42 U.S.C. § 1981 claims. The Court declines to exercise supplemental jurisdiction over the remaining state and city law claims.

## BACKGROUND

The following facts, construed in the light most favorable to the plaintiffs, are undisputed unless otherwise noted.[1]  *See, e.g., Brod v. Omya, Inc.*, 653 F.3d 156, 164 (2d Cir. 2011).

### I.     The Parties

Plaintiff is an African-American woman of Ghanaian descent who was twenty-four years old when her employment ended.[2]  Def. 56.1 ¶ 6.  Defendant HHC is a public benefit corporation, operating under the laws of the State of New York.  Compl. ¶ 10.  During the relevant period, HHC owned and operated Harlem Hospital Medical Center ("Harlem Hospital"), which is a public hospital.  *Id.* ¶ 12.

Plaintiff began working at Harlem Hospital as a permanent Clerical Associate, Level III, on July 21, 2014.  Def. 56.1 ¶ 5.  Plaintiff's employment at HHC was subject to a one-year probationary period.  *Id.* ¶ 21.  As a Clerical Associate, Level III, Plaintiff's job responsibilities included filing, data entry, canning, printing, and faxing of documents, including medical records, as well as the preparation and maintenance of medical records.  *Id.* ¶ 8.  Plaintiff's employment ended on April 28, 2015.  *Id.* ¶ 5.

At all times during her employment, Plaintiff's direct supervisor was Defendant Simmonds, Clerical Associate, Level IV.  *Id.* ¶ 11.  Simmonds is an African-American woman who was fifty-eight years old at the time of the events in question.  *Id.* ¶ 12.  Simmonds reported

---

[1] These facts are drawn from the parties' submissions in connection with Defendants' motion for summary judgment, including Defendants' Rule 56.1 Statement in Support of their Motion for Summary Judgment ("Def. 56.1") and Plaintiff's Response ("Pl. Res. 56.1") and Counterstatement ("Pl. Counter. 56.1").  Where facts stated in a party's Rule 56.1 statement are supported by testimonial or documentary evidence, and denied by any conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true.  S.D.N.Y. Local Rule 56.1(c)-(d).

[2] Although Plaintiff sets forth a claim of age discrimination, in violation of the NYCHRL, she does not bring a claim for age discrimination in violation of the Age Discrimination in Employment Act (the "ADEA"), nor could she, as the ADEA only prohibits discrimination against individuals who are at least forty years of age.  *See* 29 U.S.C. § 631.

to Defendant Hanson, Associate Director of the Emergency Department. *Id.* ¶ 13. Hanson is an African-American woman of Ghanian descent who was thirty-one. *Id.* ¶ 14. Hanson in turn reported to Vivien Salmon, the Senior Associate Director, who is not a party to this action. *Id.* ¶ 15.

## II.     The Events Giving Rise to the Discrimination and Retaliation Claims

In July 2014, soon after Plaintiff commenced her employment at HHC, several of her co-workers—Malika Thompson, Sabrina Magobet, and Annick Green—asked her questions she found offensive, such as how she knew of her job at such a young age and where her "name originated from, because [her] name is very different and it is not common." Pl. Counter. ¶ 6. Magobet also asked Plaintiff where her "people" came from and whether she had children. *Id.* ¶ 8. Green further asked Plaintiff about her national origin and age. *Id.* ¶ 9.

As part of her duties, Simmonds was responsible for creating the monthly schedule for Clerical Associates. Def. 56.1 ¶ 26. From July 2014 until January 2015, Simmonds used "CA"—short for "Clerical Associate"—as Plaintiff's title on the monthly schedule. *Id.* ¶ 27. The term CA was typically reserved for temporary hires. *Id.* ¶ 29. When Plaintiff complained about the title designation, Simmonds responded that she—Simmonds—was "the adult in the conversation." Pl. Counter. ¶ 13. Plaintiff's colleagues also referred to her as the "only clerical associate three under the age of forty" and "the baby of the bunch." *Id.*

In late 2014, Simmonds approached Plaintiff in private, approximately ninety feet from the other clerical associates. Def. 56.1 ¶ 36. Simmonds then purportedly stated the following: "Girl, I don't know how to tell you this, but you need to do something about that smell." Pl. Res. ¶ 32. According to Plaintiff, Simmonds further told her that "nobody wanted to bring it to [her] attention, because we're not sure if your kind uses commercial soap or herbal soap," Pl. Mot. Ex. C, and that no one "kn[ew] if [her] smell was with regard to [her] heritage and that young people carry a

3

stronger stench," Pl. Res. ¶ 32. Plaintiff perceived Simmons to be "very sarcastic." *Id.* at ¶ 34. On December 1, 2014, Plaintiff sent an email to Hanson, complaining of Simmonds' conduct and stating that she felt harassed "because every [*sic*] since Ive [*sic*] been employed here, theres [*sic*] has been always malicious comments regarding my age, or being African/illegal citizen." Pl. Mot. Ex. C.

On February 16, 2015, co-worker Janay Hunt approached Plaintiff while she was eating lunch and accused her of "[not] car[ing] about [herself]" and further stated that she "wears the same crusty ass ponytail . . . never wears [her] hair out, . . . can't afford a lot of weave tracks, [is] mad black, [her] edges are crusty, and [she does] things for negative attention."[3] Def. 56.1 ¶ 40. On February 17, 2015, Plaintiff sent an email to Hanson regarding the incident. *Id.* ¶ 39. Hanson submitted a report to HHC Human Resources within several hours of receiving Plaintiff's email. *Id.* ¶ 42. HR recommended that Hunt's employment with HHC be terminated, effective that same day. *Id.* ¶ 43. Hanson agreed with the recommendation and requested that HR proceed with terminating Hunt's employment. *Id.* ¶ 44. Hanson also reassigned Malika Thompson, who was with Hunt during the confrontation, from Tour II—Plaintiff's shift—to Tour I. *Id.* ¶ 45.

During her employment, Plaintiff worked her typical shift on Thanksgiving, Christmas, New Year's Day, and Easter. *Id.* ¶ 48. Plaintiff did not request that she not be scheduled to work on those, or any other particular days. *Id.* ¶ 49. Plaintiff was not the only Tour II employee to work during these holidays. *Id.* ¶ 53. The other employees who were scheduled to work on Christmas Day 2014 included Annick Green, a Caucasian woman in her late thirties or forties and Cynthia Cook, a black woman in her sixties. *Id.* ¶ 54. Malika Thompson, a black woman in her late twenties, was not scheduled to work on Christmas Day 2014. *Id.* ¶ 55.

---

[3] Plaintiff claimed in her deposition that Hunt also called her "stink" and "burnt." In Plaintiff's email sent the day after the incident, however, she does not mention that Hunt used either word.

In March 2015, Plaintiff requested time off and Simmonds "made a remark about [Plaintiff's] age and about [her] not having children." Pl. Counter. ¶ 17. Simmonds told Plaintiff that the reason she was not granted her requested leave despite other clerical associates at her level getting leave was "because they're much older" and "have families and responsibilities whereas you do not." *Id.* ¶ 18.

On Friday, April 17, 2015, Plaintiff was summoned to a meeting with Vivienne Salmon and Hanson regarding Plaintiff's use of a software program entitled Quadramed. Def. 56.1 ¶ 68. Quadramed stores medical records and allows HHC to track the registration and treatment of patients. *Id.* ¶ 58. Plaintiff's duties included entering patient information into Quadramed. *Id.* ¶ 57. Plaintiff had successfully completed an assessment of her competency in performing all functions of the software. *Id.* ¶ 59.

The nature of the Quadramed incident is in dispute. Plaintiff claims that she accidentally selected the name of her co-worker, Malika Thompson, when discharging two patients, thereby mistakenly memorializing that Thompson had discharged the patients. Pl. Res. ¶ 60. Defendants claim that the error was made with malicious intent in order to retaliate against Thompson. Def. 56.1 ¶¶ 67, 70. According to Defendants, Plaintiff discharged the patients from Quadramed before they received treatment. *Id.* ¶ 61. If something had happened to one of the patients, the person who had registered them would have been held responsible. *Id.* ¶¶ 63-64. After meeting with Plaintiff, Salmon and Hanson discussed Plaintiff's conduct and requested that Plaintiff's probationary employment be terminated for having engaged in "reckless behavior and fail[ing] to follow the registration process." *Id.* ¶ 70. The next day, April 18, Sabrina Magobet, one of Plaintiff's co-workers, distributed papers, which allegedly reflected errors made by Plaintiff,

exclaiming, "we finally got this bitch" and "we are going to get this burnt bitch out of here." Pl. Counter. ¶ 19.

Plaintiff had not had a performance evaluation prior to April of 2015. Def. 56.1 ¶ 74. The evaluation conducted at that time set forth a "below standard" rating for Plaintiff, citing the Quadramed incident. *Id.* ¶ 76. Carla Vasquez, a Personnel Labor Relations Associate at HHC, met with Plaintiff on April 28, 2015, at which point she informed Plaintiff that her probationary employment was being terminated. *Id.* ¶ 71. A representative of Plaintiff's union was present at the meeting. *Id.* ¶ 72. After discussing the issue with Vasquez, Plaintiff eventually indicated on the relevant paperwork that she was resigning due to a disagreement with her supervisor. *Id.* ¶ 78.

## III.   Procedural History

On September 25, 2015, Plaintiff obtained her right to sue letter from the Equal Employment Opportunity Commission. Dkt. 1. She filed her complaint on October 14, 2015, Dkt. 1, and the parties engaged in mediation from January to March of 2016, Dkt. 15. On February 24, 2017, after discovery was complete, Defendants filed the instant motion for summary judgment. Dkt. 27.

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 authorizes a court to grant summary judgment to a moving party if the movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Roe v. City of Waterbury*, 542 F.3d 31, 35 (2d. Cir. 2008). A fact is "material" if it "might affect the outcome of the suit under the governing law," and it is "genuinely in dispute" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citations and internal quotation marks omitted). In deciding a motion for summary judgment, the Court must "construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against

the movant." *Brod*, 653 F.3d at 164 (citation and internal quotation marks omitted). The moving

party has the initial burden of demonstrating that no genuine issue of material fact exists. *Id.* If

the moving party satisfies this burden, "the opposing party must come forward with specific

evidence demonstrating the existence of a genuine dispute of material fact" to survive summary

judgment. *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011).

## DISCUSSION

### I.   Title VII Hostile Work Environment

Title VII of the 1964 Civil Rights Act makes it unlawful for any employer "to fail or refuse

to hire or to discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such

individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). This

provision provides causes of action for both discrimination and hostile work environment. *See*

*Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993). The Court construes Plaintiff's opposition to

summary judgment as asserting a claim for hostile work environment.[4] A claim for hostile work

environment has two elements: (1) the conditions must be sufficiently severe or pervasive, *see*

*Terry v. Ashcroft*, 336 F.3d 128, 147-48 (2d Cir. 2003), and (2) there must be a basis for imputing

liability to the employer, *see Perry v. Ethan Allen, Inc.*, 115 F.3d 143, 149 (2d Cir. 1997).

---

[4] Defendants accurately note that Plaintiff failed to explicitly plead hostile work environment in the Complaint, instead alleging discrimination under Title VII. *See* Compl. ¶¶ 85-87. In her opposition to summary judgment, however, Plaintiff does not defend her discrimination claim and instead opposes summary judgment with respect to a Title VII hostile work environment claim. In instances such as this, courts in this Circuit have found the plaintiff to have abandoned the claim set forth in the Complaint. *See Kovaco v. Rockbestos-Surprenant Cable Corp.*, 834 F.3d 128, 144 (2d Cir. 2016). Moreover, where, as here, the plaintiff did not explicitly plead a cause of action but asserted sufficient facts in the Complaint to properly put the claim before the court and to provide defendants with notice as to the nature of the claim, courts may consider the unpled claim in ruling upon summary judgment, so long as prejudice will not result. *See Cruz v. Coach Stores, Inc.*, 202 F.3d 560, 569-70 (2d Cir. 2000), *superseded on other grounds by* N.Y.C. Local Law No. 85. Accordingly, the Court deems Plaintiff to have abandoned her Title VII discrimination claim and instead to have asserted a hostile work environment cause of action. Even if the Court were to consider Plaintiff's Title VII discrimination, it would lack merit because she has failed to demonstrate a causal connection between the alleged discriminatory behavior and the termination of her employment. *See Vivenzio v. City of Syracuse*, 611 F.3d 98, 106 (2d Cir. 2010).

The first prong requires the plaintiff to show that "the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment.'" *Id.* There are both objective and subjective elements: "the misconduct must be severe or pervasive enough to create an objectively hostile or abusive work environment and the victim must also subjectively perceive that environment to be abusive." *Alfano v. Costello*, 294 F.3d 365, 374 (2d Cir. 2002). "It is axiomatic that the plaintiff also must show that the hostile conduct occurred because of a protected characteristic." *Tolbert v. Smith*, 790 F.3d 427, 439 (2d Cir. 2015).

The objective hostility of a workplace is assessed based on the totality of the circumstances. *Patane v. Clark*, 508 F.3d 106, 113 (2d Cir. 2007). Although the objective prong is not a "precise test," courts are to consider the following factors: "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23. "Our case law treats the first two of these factors—the frequency and the severity of the misconduct—as the principal focus of the analysis." *Aulicino v. New York City Dep't of Homeless Services*, 580 F.3d 73, 82 (2d Cir. 2009). As a "general rule," moreover, "incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive." *Alfano*, 294 F.3d at 374 (citation and internal quotation marks omitted). "Usually, a single isolated instance of harassment will not suffice to establish a hostile work environment unless it was extraordinarily severe." *Howley v. Town of Hartford*, 217 F.3d 141, 153 (2d Cir. 2000) (citation and internal quotation marks omitted).

If both the objective and subjective elements are satisfied, a plaintiff must also show "that a specific basis exists for imputing the conduct that created the hostile environment to the

employer." *Perry*, 115 F.3d at 149. "When harassment is perpetrated by the plaintiff's coworkers, an employer will be liable if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Id.* "In cases in which the harasser is a 'supervisor,' however, different rules apply. If the supervisor's harassment culminates in a tangible employment action, the employer is strictly liable. But if no tangible employment action is taken, the employer may escape liability by establishing, as an affirmative defense, that (1) the employer exercised reasonable care to prevent and correct any harassing behavior and (2) that the plaintiff unreasonably failed to take advantage of the preventive or corrective opportunities that the employer provided." *Vance v. Ball State Univ.*, 133 S. Ct. 2434, 2439 (2013).

## A. Objective Hostility

Plaintiff has failed to adduce sufficient evidence upon which a reasonable jury could conclude that the alleged discrimination was severe or pervasive enough to create an objectively hostile work environment. In considering the totality of the circumstances and following the Supreme Court's guidance in *Harris v. Forklift Systems*, the Court is persuaded that Defendants are entitled to summary judgment with respect to Plaintiff's hostile work environment claim. Because the Court concludes that Plaintiff has failed to satisfy the first prong of the hostile work environment test, it does not reach the second prong, *i.e.*, whether liability may be imputed to the employer.

### 1. Age is Not a Protected Characteristic Under Title VII

The bulk of the evidence upon which Plaintiff relies relates to purported mistreatment that was allegedly motivated by discriminatory animus based on her age. Age, however, is not a protected characteristic under Title VII. *See* 42 U.S.C. § 2000e-2 (prohibiting discrimination on the basis of an individual's "race, color, religion, sex, or national origin"). Accordingly, such

conduct cannot give rise to a Title VII hostile work environment claim. *See Grays v. SDH Educ. West, LLC*, No. 16-CV-666 (DAB), 2017 WL 2240227, at *5 (S.D.N.Y. Mar. 23, 2017) ("Age is not a protected class under Title VII.").

### 2. Frequency

Those incidents which Plaintiff alleges were motivated by discriminatory animus on the basis of her membership in groups falling under the protection of Title VII—race and national origin—did not occur with great frequency. The Second Circuit has held that "[f]or racist comments, slurs, and jokes to constitute a hostile work environment, there must be more than a few isolated incidents of racial enmity, meaning that instead of sporadic racial slurs, there must be a steady barrage of opprobrious racial comments." *Schwapp v. Town of Avon*, 118 F.3d 106, 110 (2d Cir. 1997) (alteration, citations, and internal quotation marks omitted). Here, the incidents did not occur with such frequency. *See id.*

During Plaintiff's approximately nine-month tenure at HHC, there were three specific instances of conduct that could be viewed as based on her race or national origin: (1) the late 2014 incident in which Plaintiff's supervisor, Simmonds, approached her regarding her body odor and queried whether the smell was the result of Plaintiff's "heritage"; (2) the February 16, 2015 incident in which co-worker Janay Hunt confronted Plaintiff primarily about her hygiene, but called her, among other things, "mad black"; and (3) the April 18, 2015 incident in which co-worker Sabrina Magobet said that "we are going to get this burnt bitch," naming Plaintiff, "out of here." In her deposition, Plaintiff also made vague allegations that, during her first week of employment, three co-workers asked about her background including "where her name originated from" and that such questions "continued." Pl. Counter. ¶¶ 6-7. Plaintiff made similarly vague allegations about mistreatment based on her race and national origin in an email she sent to Hanson following the first 2014 incident. Pl. Mot. Ex. C. Plaintiff has not produced any evidence,

however, as to the specifics of these questions or comments, nor the frequency with which they were made. *See Petrisch v. JP Morgan* Chase, 789 F. Supp. 2d 437, 452 (S.D.N.Y. 2011) (Plaintiff failed to show that conduct was sufficiently pervasive and severe where he alleged that offensive comment was made "more than once but could not be any more specific"). The Court thus concludes that Plaintiff has not provided sufficient proof for a reasonable jury to find that discriminatory incidents occurred in substantial quantity or with great frequency. *See Alfano*, 294 F.3d at 379; *Lessambo v. PricewaterhouseCoopers, L.P.*, No. 08 Civ. 6272(WHP), 2010 WL 3958787, at *11 (S.D.N.Y. Sept. 27, 2010) (supervisor's "three offensive remarks" about employee's national origin did not create a hostile work environment), *aff'd*, 451 F. App'x 57 (2d Cir. 2011) (summary order); *Manessis v. N.Y. City Dep't of Transp.*, No. 02-CV-359(SAS), 2003 WL 289969, at *5-6 (S.D.N.Y. Feb. 10, 2003) (finding evidence of two incidents that arguably showed discriminatory bias against employee on the basis of his national origin insufficient to survive summary judgment on hostile work environment claim), *aff'd sub nom. Manessis v. Chasin*, 86 F. App'x 464 (2d Cir. 2004) (summary order); *cf. Rivera v. Rochester Genesee Reg'l Transp. Auth.*, 743 F.3d 11, 20-21, 23 (2d Cir. 2014) (evidence that co-workers referred to a plaintiff with a racial epithet "probably like three times" and led a racially insensitive chant against him "about five times" presented a "close call" and was "(barely) enough evidence—both the use of ethnic slurs and the broader bullying and physical harassment—from which a reasonable jury could find that [defendant] harassed [plaintiff] not merely because of their personal history, but also because he was Puerto Rican").

### 3. Severity

Plaintiff correctly notes that, even if discriminatory incidents are infrequent, they may still be severe enough to be actionable. *See Harris*, 510 U.S. at 21 (the relevant standard is "sufficiently severe or pervasive"). Indeed, some courts have found a single incident to have rendered the work

environment objectively hostile. Plaintiff relies upon *Howley v. Town of Stratford*, 217 F.3d 141, 154 (2d Cir. 2000), for this proposition. In *Howley*, the male defendant, amidst a large group in which the plaintiff was the sole female surrounded by many of her male subordinates, loudly proclaimed that she had only gained her relatively senior position of lieutenant by "performing fellatio." *Id.* The court concluded that, under those circumstances, the defendant was not entitled to summary judgment merely because he committed only one discriminatory act during the relevant period. *Id.*

None of the three incidents specified here, however, are comparable in their severity to the events in *Howley* or to the other instances in which courts have found that a hostile work environment resulted from a relatively small number of incidents. The comments made during the first two of the three incidents appear to relate primarily to Plaintiff's hygiene and the last two seem mainly to evince personal hostility towards Plaintiff by her co-workers.[5] Such sentiments, however, do not provide a legitimate basis for a hostile work environment claim unless motivated by Plaintiff's membership in a class protected under Title VII. *See Stembridge v. City of New York*, 88 F. Supp. 2d 276, 286 (S.D.N.Y. 2000) (distinguishing between merely offensive utterances and acts, which are not actionable under Title VII, and "statements legitimately evinc[ing] racial hostility"). To the extent the comments here were at all motivated by Plaintiff's race or national origin, those comments were not so severe as to negatively affect the conditions of her employment. *See Negron v. Rexam, Inc.*, 104 F. App'x 768, 770 (2d Cir. 2004) (summary order) (summary judgment was properly granted against plaintiff where "on a handful of occasions [plaintiff's] co-worker addressed him using a racial epithet, including once over the loudspeaker"); *Liburd v. Bronx Lebanon Hosp. Ctr.*, No. 07-CV-11316 (HB), 2009 WL 900739, at *8 (S.D.N.Y.

---

[5] HHC fired Janay Hunt—the co-worker who confronted Plaintiff in the second incident—on the same day Plaintiff complained of her behavior. *See* Def. 56.1 ¶ 44.

12

April 3, 2009) (granting defendants summary judgment where plaintiff alleged that he was referred to as "black ass" on three occasions because, although "offensive and inappropriate," it was not "so pervasive and severe so as to alter [plaintiff's] employment conditions for the worse"). Moreover, none of the comments connected Plaintiff's membership in a protected class to an alleged inability to adequately perform her job responsibilities. *See Howley*, 217 F.3d at 153 (the plaintiff was a commanding officer at a fire department whose "ability to lead in . . . life-threatening circumstances" could be impaired by "gender-based skepticism as to [her] competence"). Thus, no reasonable jury could find that the incidents were sufficiently severe to render HHC an objectively hostile work environment.

### 4. Remaining Factors

Finally, the last two *Harris* factors, while given less weight in this Circuit, *see Aulicino*, 580 F.3d at 82, similarly undercut Plaintiff's claim. First, Plaintiff has not provided any evidence that the comments, though hurtful, were physically threatening. Second, Plaintiff has not proven how these episodes interfered with her work performance.

In considering the totality of the circumstances, therefore, no reasonable jury could conclude that an objectively hostile work environment existed at HHC. Accordingly, Defendants are entitled to summary judgment with respect to this claim.

## II.  Title VII Retaliation

Plaintiff also alleges retaliation in violation of Title VII. At the summary judgment stage, Title VII retaliation claims are governed by the framework enunciated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-03 (1973). *See Gorzynski v. JetBlue Airways Corporation*, 596 F.3d 93, 110 (2d Cir. 2010). Under this framework, a *prima facie* showing by the plaintiff creates a "presumption of retaliation," thereby shifting the burden to the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action."

*Jute v. Hamilton Sundstrand Corp.*, 420 F.3d 166, 173 (2d Cir. 2005). If the defendant provides

such an explanation, the presumption in favor of the plaintiff dissipates and he must then prove

that the desire to retaliate was the but-for cause of the challenged employment action. *See Univ.

of Tex. Sw. Med. Ctr. v. Nassar,* 133 S. Ct. 2517, 2528 (2013).

Title VII prohibits employers from retaliating against employees on the basis of their

opposition to an employment practice made unlawful by Title VII. *See* 42 U.S.C. § 2000e-3(a).

In order to show a *prima facie* case of retaliation in response to a motion for summary judgment,

a plaintiff must submit sufficient admissible evidence to allow a trier of fact to find: (1) conduct

by the plaintiff that is protected activity under Title VII; (ii) of which the employer was aware;

(iii) followed by an adverse employment action of a nature that would deter a reasonable employee

from making or supporting a discrimination claim; (iv) that was causally connected to the protected

activity. *Cox v. Onondaga Cty. Sheriff's Dep't,* 760 F.3d 139, 145 (2d Cir. 2014). Plaintiff's claim

fails because she has not demonstrated (1) the exercise of protected activity that (2) bears a causal

relationship to the adverse employment action.

Protected activity is defined as the "oppos[ition of] any practice made an unlawful

employment practice" by Title VII or the "participat[ion] in any manner in an investigation,

proceeding, or hearing" under Title VII. 42 U.S.C. § 2000e-3(a). As the Second Circuit's

"decisions have emphasized," however, "an employment practice need not actually violate Title

VII for the protected activities element of a retaliation claim to be satisfied. The plaintiff is only

required to have had a good faith, reasonable belief that he was opposing an employment practice

made unlawful by Title VII." *McMenemy v. City of Rochester,* 241 F.3d 279, 285 (2d Cir. 2001).

"The onus is on the speaker to clarify to the employer that he is complaining of unfair treatment

due to his membership in a protected class and that he is not complaining merely of unfair

treatment generally." *Aspilaire v. Wyeth Pharm., Inc.*, 612 F. Supp. 2d 289, 308-09 (S.D.N.Y. 2009).

"In assessing whether a plaintiff has established that an adverse employment action was motivated by discriminatory retaliation, there are two distinct ways for a plaintiff to prevail— either by proving that a discriminatory motive, more likely than not, motivated the defendants or by proving both that the reasons given by the defendants are not true and that discrimination is the real reason for the actions." *Summa v. Hofstra Univ.*, 708 F.3d 115, 129 (2d Cir. 2013) (citation and internal quotation marks omitted). In this Circuit, there is no "bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship between the exercise of a federal constitutional right and an allegedly retaliatory action." *Littlejohn v. City of New York*, 795 F.3d 297, 319 (2d Cir. 2015) (citation and internal quotation marks omitted).

In opposition to Defendants' motion for summary judgment, Plaintiff argues that an April 2015 meeting with Defendant Hanson is the protected activity upon which her retaliation claim is based because Plaintiff believes it led to the decision to terminate her employment, even though she ultimately claimed that she was resigning due to a disagreement with her employer. Although Plaintiff does not rely upon them in her opposition papers, the Court also considers whether various emails Plaintiff sent while employed at HHC may qualify as protected activity bearing a causal relationship to the adverse employment action.

### A. The April 2015 Meeting

In the April 2015 meeting, Plaintiff complained of the following: (1) her treatment by co-workers; (2) Sabrina Magobet's retaliatory comment—"we are going to get this burnt bitch out of here"—after the Quadramed incident; and (3) the manner in which the Quadramed situation was

being resolved. *See* Plaintiff Ex. A 81:14-84:6, Ex. G. Plaintiff also mentioned contacting Eugene Williams, the union representative, to which Hanson responded: "Well, if you contacted him, then I can contact someone as well. If I hear from him, I will change your tour, to tour one [the overnight shift]." Pl. Mot. Ex. A 85:8-85:19, Ex. B.

This meeting cannot serve as the protected activity underlying Plaintiff's retaliation claim for a simple reason: it occurred *after* Vivienne Salmon submitted the April 20 formal request to fire Plaintiff. Plaintiff asserts in her opposition papers that the meeting with Hanson occurred on April 20; Defendants claim that it occurred on April 21. In her affidavit submitted with her opposition to summary judgment, however, Plaintiff avers that the meeting indeed occurred on April 21. More importantly, Plaintiff has submitted an email—the only contemporaneous evidence in the record—that she sent to the union representative, Eugene Williams, on April 21 in which she references a meeting she had "[e]arlier this morning," *i.e.*, on April 21, with Hanson. The email's description of the meeting between Plaintiff and Hanson is otherwise wholly consistent with Plaintiff's deposition testimony regarding the meeting. *Compare* Pl. Mot. Ex. A 81:14-85:19 *with* Ex. G. Because no genuine dispute of material fact exists as to the timing of the meeting—*i.e.*, it was after Salmon submitted the formal request to fire Plaintiff—the April 2015 meeting cannot serve as the protected activity underlying Plaintiff's claim. *See Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001) (finding it "immaterial" that adverse employment action occurred one month after protected activity because employer had been "contemplating" the adverse action before learning of the protected activity); *see also Uddin v. City of New York*, 427 F. Supp. 2d 414, 433 (S.D.N.Y. 2006) ("adverse actions which take place before defendant [became] aware of the protected activity" cannot support retaliation claim).

**B. The February 17, 2015 Email**

On February 17, 2015, Plaintiff sent an email to Simmonds concerning the February 16 confrontation with co-worker Janay Hunt. Def. 56.1 ¶ 40. This email also fails to qualify as protected activity. As previously discussed, when the basis for a hostile work environment claim is the conduct of co-workers, an employer will be liable only "if the plaintiff demonstrates that the employer either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it." *Perry*, 115 F.3d at 149. Here, it is undisputed that after Plaintiff complained to Hanson about Hunt's comment, Hunt was fired the same day and the other woman who was present, Thompson, was moved out of Plaintiff's work shift. Def. 56.1 ¶¶ 42-45. In light of HHC's swift reaction to terminate Hunt's employment following Plaintiff's complaint, no reasonable jury could find that liability should be imputed to the employer here, and the email does not qualify as protected activity. *See Reed v. A.W. Lawrence & Co., Inc.*, 95 F.3d 1170, 1180 (2d Cir. 1996).

**C. The December 1, 2014 Email**

On December 1, 2014, Plaintiff sent another email, this time to Hanson, with two complaints. First, Plaintiff complained of the conversation she had with her supervisor, Simmonds, in which Simmonds commented on Plaintiff's body odor. Pl. Counter. ¶ 12. Plaintiff also stated that she felt harassed "because every [*sic*] since Ive [*sic*] been employed here, theres [*sic*] has been always malicious comments regarding my age, or being African/illegal citizen." Pl. Mot. Ex. C.

This email is too attenuated in time to Plaintiff's forced resignation to give rise to an inference of causation. Although there is no "bright line" in this Circuit establishing how close in time protected activity must be to an adverse employment action in order to give rise to an inference of causation, *see Gorman-Bakos v. Cornell Co-Op Extension of Schnectady Cty.*, 252

F.3d 545, 554-55 (2d Cir. 2001), the nearly five-month period between the December 1, 2014 email and Salmon's April 20, 2015 request for Plaintiff's termination is simply too long to allow for such an inference, *see Breeden*, 532 U.S. at 273-74 (citing cases in which courts found that three and four month gaps between protected activity and temporal proximity were insufficient to establish causal connection); *Gorman-Bakos*, 252 F.3d 545, 554 (2d Cir. 2001) (four months insufficient to establish causation); *Hollander v. Am. Cyanamid Co.*, 895 F.2d 80, 85-86 (2d Cir. 1990) (three and a half month lapse was too attenuated to give rise to inference of causation); *Russell v. N.Y. University*, 15-CV-2185-GHW, 2017 WL 3049534, at *36 (S.D.N.Y. July 17, 2017) ("courts in the Second Circuit have generally considered two to four months to be the outer edge of what courts recognize as sufficiently proximate to admit of an inference of causation" (citation and internal quotation marks omitted); *Woods v. Enlarged City Sch. Dist. of Newburgh*, 473 F. Supp. 2d 498, 528-29 (S.D.N.Y. 2007) (a five-month delay did not give rise to an inference of causation); *Yarde v. Good Samaritan Hosp.*, 360 F. Supp. 2d 552, 562 (S.D.N.Y. 2005) ("[t]hree months is the outer edge of what courts in this circuit recognize as sufficiently proximate to admit an inference of causation"). *But see Abrams v. Dep't of Pub. Safety*, 764 F.3d 244, 254 (2d Cir. 2014) (recognizing that five-month delay between protected activity and adverse employment action "might be enough to establish a *prima facie* case" but resolving the question on the grounds that, regardless, such temporal proximity, alone, could not rebut defendants' legitimate, non-retaliatory explanation for the adverse employment action under the *McDonnell-Douglas* framework). This conclusion is buttressed by the absence of any other evidence that the forced resignation was the byproduct of retaliatory animus harbored towards Plaintiff and in light of the fact that HHC promptly fired another woman—Hunt—for making allegedly discriminatory comments towards Plaintiff.

Plaintiff has thus failed to adduce evidence establishing that the exercise of protected activity bore a causal relationship to the adverse employment action. Accordingly, Defendants are entitled to summary judgment with respect to the retaliation claim.

## III.    Section 1981 Claims

Defendants are also entitled to summary judgment with respect to Plaintiff's claims for discrimination and retaliation pursuant to 42 U.S.C. § 1981, for two reasons. First, Plaintiff has abandoned these causes of action because her opposition papers are bereft of any mention of the § 1981 claims. *See Kovaco*, 834 F.3d at 144; *Jackson v. Fed. Express*, 766 F.3d 189, 196 (2d Cir. 2014).

Second, Plaintiff has failed to properly plead and cite evidence supporting the § 1981 claims. Plaintiff alleges only that HHC, an arm of the state of New York, *see, e.g.*, *Drayton v. MetroPlus Health Plan, Inc.*, 791 F. Supp. 2d 343, 346-47 (S.D.N.Y. 2011), violated § 1981, *see* Compl. ¶¶ 91-97. But § 1981 does not provide for municipal liability. To state a valid claim for municipal liability under § 1981, a plaintiff must also allege a violation of 42 U.S.C. § 1983. *See Philippeaux v. North Central Bronx Hosp.*, 871 F. Supp. 640, 656 (S.D.N.Y. 1994) ("to assert a Section 1981 claim against municipal entities . . . plaintiff must allege a violation of Section 1983"); *Jett v. Dall. Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989). Plaintiff has failed to do so.

Even if she had alleged a violation § 1983, moreover, her claims would still be deficient because she has not adequately pled the elements of *Monell*, which requires that a plaintiff's injuries be the result of a municipal policy or custom. *See Philippeaux*, 871 F. Supp. at 656 ("to assert a Section 1981 claim against municipal entities . . . plaintiff must . . . meet the requirements of *Monell*"). Moreover, Plaintiff has not shown that her supervisors—the only individuals to whom Plaintiff attributes discriminatory or retaliatory conduct—were final policy makers such

that their actions can result in municipal liability for HHC. *See Carrero v. New York City Hous.* *Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (housing authority was not liable because supervisor's actions were not attributable to its practice or policy and housing authority's stated policies were explicitly non-discriminatory).

## IV.     State and City Law Claims

Plaintiff also brings causes of action alleging breach of contract and discrimination and retaliation in violation of the NYCHRL. The Court declines to exercise supplemental jurisdiction over these remaining claims.

Federal district courts have supplemental jurisdiction over non-federal law claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). A district court may, at its discretion "decline to exercise supplemental jurisdiction" if it "has dismissed all claims over which it has original jurisdiction." *Id.* § 1367(c)(3). The Supreme Court has instructed that, in deciding whether to exercise supplemental jurisdiction, a district court should balance the traditional "values of judicial economy, convenience, fairness, and comity." *Carnegie Mellon Univ. v. Cohill,* 484 U.S. 343, 350 (1988). As a general rule, "if a plaintiff's federal claims are dismissed before trial, the state claims should be dismissed as well." *Brzak v.* *United Nations*, 597 F.3d 107, 113-14 (2d Cir. 2010) (citation and internal quotation marks omitted). Although the exercise of supplemental jurisdiction is discretionary, the ordinary case "will point toward declining jurisdiction over the remaining state-law claims." *In re Merrill Lynch* *Ltd. P'ship Litig.*, 154 F.3d 56, 61 (2d Cir. 1998) (quoting *Cohill,* 484 U.S. at 350 n.7). Accordingly, the Court declines to exercise supplemental jurisdiction over Plaintiff's remaining claims.

# CONCLUSION

For the foregoing reasons, Defendants' motion for summary judgment is granted as to Plaintiff's Title VII and 42 U.S.C. § 1981 claims and the Court declines to exercise supplemental jurisdiction over the remaining state and city law claims. The Clerk of Court is respectfully directed to terminate item number 27 on the docket and to close the case.

SO ORDERED.

Dated:    October 25, 2017
          New York, New York

                                          Ronnie Abrams
                                          United States District Judge